COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                NO.
 2-08-300-CR

 

 

DEMARKCUS L. CLARK                                                                     APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

          FROM
CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

 

                                                       ------------

 

                                                      OPINION

 

                                                       ------------

I. 
Introduction








A grand
jury indicted Appellant Demarkcus L. Clark on February 2, 2007. The indictment
alleged that on or about July 25, 2004, Appellant intentionally caused the
death of Keiss Allison by shooting him with a firearm during the course of
committing or attempting to commit robbery.[1]  Appellant pleaded not guilty at his trial in
August 2008.  The jury found Appellant
guilty of capital murder, and the trial court sentenced him to life in prison.  Appellant contends in two points that the
evidence is factually insufficient to sustain his conviction and that he
received ineffective assistance of counsel. 
We affirm.

II.  Factual
Background

At
approximately 1 a.m. on July 25, 2004, Fort Worth police officers responded to
a reported shooting at an apartment complex. 
Officer James Chilson was the first to arrive, and he testified that he
saw the victim, Keiss Allison, lying in the roadway approximately 100 feet from
his apartment, with six or more people standing nearby. 

Christopher
Carter testified that he lived with Allison at the time of the shooting, that
he met Allison while Arunning around looking for some
dope,@ that
Allison was a drug dealer, and that Allison supplied drugs to him in exchange
for the use of his car.  Carter admitted
he had abused drugs, specifically crack cocaine, the day of the shooting, but
he testified he had been Aclean@ for
about a year as of the time of trial. 
Carter also testified, however, that he was on parole from a fifty-year
sentence for unauthorized use of a motor vehicle.  

Carter
testified that a Akind of a chubby fellow@ driving
a brown or tan Buick LeSabre or similar car had stopped at the apartment
earlier on the night of the shooting and asked for Allison.  Carter told the man Allison was not
there.  








Carter
last saw Allison in the apartment at approximately 9 p.m. the night of the
shooting when Carter left to go to the store with Tonya Fluker and other people
he did not know.[2]  When he and the others returned from the
store, Carter saw a man he described as Aa slim
fella@ in the
apartment parking lot carrying a pistol-grip shotgun.  Carter testified that he did not see the man
well enough to identify him for the police but that the car he had seen earlier
that night was Apossibly@ at the
apartment at the time.  The man with the
shotgun told the driver of the car that it would be best if they left.  Carter Abailed
out of the truck, ran into the front of the apartments[,] and . . . hid behind
some trash cans.@ 
He heard about three gunshots while hiding.  After he felt it was safe to do so, Carter
emerged from his hiding place and sat on the curb in front of the
apartments.  He admitted, however, that
he subsequently Akind of ran and ducked and dodged@ the
police for approximately two years because he did not want to be involved.  








Anthony
Foreman testified that Allison was a friend and one of his drug dealers.  Foreman walked to Allison=s
apartment about midnight the night of the shooting to Ado drugs,@ and when
he arrived, Allison and Christopher Henderson were standing in the apartment
doorway Arapping
about [him] walking over there.@  Foreman testified that he, Allison, and
Henderson had been standing by the gate near Allison=s
apartment when a gold Cutlass pulled into the parking lot.  A heavy-set, African-American man got out of
the passenger-seat and walked up to the fence. 
On Allison=s invitation, Allison and the man
went inside the apartment together.  A
slimmer African-American man then got out of the rear passenger-seat of the
car, and Henderson told the man to wait outside.  The slimmer man Agot mad
and told [Henderson] that was his money and he was goin[g] in there about the
business, too.@ 
Foreman testified that he was able to calm the man down for a moment and
that Allison opened the apartment door and invited the slimmer man inside.  Henderson also went inside after a few
moments. 

While
Foreman waited outside, the slimmer man came out of the apartment and walked to
his car.  At about the same time, the
vehicle with Carter, Fluker, and a man named AFish@ inside
drove into the parking lot.  The slimmer
man talked to the people in Fish=s car and
then tapped on the trunk of the gold Cutlass Ato alert
the guy on the inside to pop the trunk.@  The driver of the car, who Foreman testified
he saw in the car but did not see his face, Apopped
his trunk button and [the slimmer man] open[ed] the trunk and pulled out a
12-gauge.@ 
Foreman testified that the slimmer man walked up to him, pointed the
shotgun at him, and told him to go inside the apartment.  Foreman refused and ran toward a church
behind the apartments.  As he ran past a
window to Allison=s apartment, Foreman heard
Allison tell the men that he was not going to give them anything else and that
he had given them everything he had. 
From the church, Foreman looked back, saw three people running away from
Allison=s
apartment toward the parking lot, and heard five gunshots. 








Foreman
ran back to Allison=s apartment and went inside to
see if anyone had been shot.  Not seeing
anyone in the apartment, he went to a neighbor=s
apartment to ask her to call the police, but Foreman heard Fluker saying, AHere he
is right here.@ 
Foreman then saw Allison lying in the middle of the street. Foreman
testified that the police interviewed him that night and that he went to the
police station with the officers Ato let
them know that [he] saw everything that happened.@  On cross-examination, Foreman testified that
he had previous convictions for possession and theft and that he was not able
to identify anyone when a homicide detective showed him a photo spread. 

Detective
Matthew Hardy testified that he was the homicide detective assigned to the case
and that he arrived at the scene approximately an hour and a half after the
shooting.  Detective Hardy testified that
he interviewed Foreman, Henderson, and Fluker that night.[3]  However, the investigation continued for more
than two years. 

Detective
Hardy interviewed Duron Gibson at the Tarrant County jail in October 2005, and
Gibson directed him to Appellant a/k/a ADough
Boy.@  In January 2006, Detective Hardy spoke with
Fort Worth narcotics officer Broadwater and a confidential informant and was
able to identify Issack Fountain as a possible participant.  Detective Hardy located Fountain and
interviewed him at the Department of Corrections in DeQuincy, Louisiana.  In the interview, Fountain minimized his own
involvement and said that Appellant was the shooter. 








Detective
Hardy interviewed Appellant on August 21, 2006. 
In the interview, Appellant denied that he knew Allison or what had
happened to him. Appellant also told Detective Hardy that Prinsell Williams had
used his name in the past.  In fact,
Appellant was arrested during a federal drug investigation but later released
after investigators determined that Williams had used Appellant=s
name.  

On August
22, 2006, Detective Hardy interviewed Carter and showed him a photo spread that
included pictures of Fountain and five other African-American males.  Carter identified Fountain and said, A[T]his
kind of looks like the person who came up to the car that he was in, who had
the shotgun,@ but Carter was not completely
positive of his identification. 
Detective Hardy prepared a different photo spread that included
Appellant=s photograph, but Carter was not
able to identify anyone in that photo spread. 


Detective
Hardy testified that between Fountain, Appellant, and Avion Anderson, a man
Appellant had implicated in Allison=s death,
Appellant is physically the largest and Fountain is the thinnest.  Detective Hardy also said that the physical
descriptions in his file indicated that Fountain is five foot, ten inches and
160 pounds, that Anderson is five foot, nine inches and 190 pounds, and that
Appellant is five foot, eleven inches and either 225 or 275 pounds.[4]  Detective Hardy said that the physical
descriptions in his file are generally consistent with Fountain=s,
Anderson=s, and
Appellant=s actual heights and weights. 








Detective
Hardy also interviewed Fluker and said she tentatively identified Appellant in
a photo spread.  On the photo spread,
Fluker wrote, AI believe to my knowledge this
man [Appellant] came to SUV I was in.@[5]  Detective Hardy testified that Fluker=s identification
differed from the others; Fluker said the heavy-set man retrieved the shotgun
from the car and other witnesses said it was the skinnier man.  Detective Hardy also testified that Fluker
did not identify Appellant as the man that came to the car until she saw the
photo spread. 

Appellant
was arrested on February 5, 2007. 
Detective Hardy interviewed him later that day and obtained two written
statements.  In the first statement,
Appellant admitted being at Allison=s
apartment with Fountain and Anderson to obtain cocaine to sell but denied
knowing Allison before that night. Appellant said that Henderson pulled a
pistol-grip shotgun while Fountain and Allison were Atussling,
wrestling,@ that Fountain pulled a revolver
and forced Henderson to the ground, that Allison pushed Fountain off of
Henderson and ran out the door, and that Fountain shot Allison.  Appellant also said that Fountain threatened
to kill him and Anderson if they told anyone what had happened and that
Fountain had stolen some cocaine from the apartment. Appellant wrote that he
first learned that Allison had been killed about three days after the shooting.









In the
second statement, Appellant admitted that he did know Allison before the night
of the shooting, that he had met Allison at a dope house where a man named AHot Sauce@ lived,
and that he had told Fountain they could get some dope to sell from
Allison.  Appellant stated that he and
Fountain went to Allison=s apartment earlier the night of
the shooting, that Allison was not there at the time, and that he and Fountain
later returned to Allison=s apartment. Appellant wrote that
after he and Fountain went inside Allison=s
apartment, Fountain told Allison to Agive me
what you got,@ pointed a revolver at Allison,
and made Allison empty his pockets. 
Appellant said that Fountain took the forty dollars Allison had in his
pocket, that Henderson pulled out a shotgun, and that Fountain pointed the
revolver at Henderson and made him get on the ground.  Appellant stated that Anderson then came
through the door with the pistol-grip shotgun, that Henderson and Allison ran
out the door, and that Fountain fired five or six shots at Allison.[6]  








Detective
Hardy testified that Appellant did not admit in either of his statements to
receiving any of the proceeds of the robbery, to disposing of the cartridges
from the revolver, or to having the intent before going to Allison=s
apartment to commit an offense other than purchasing drugs.  Detective Hardy agreed that Appellant
admitted to being at the scene but did not admit to being a party to the
murder.  Detective Hardy also testified
that Appellant had given him information about a murder Fountain had committed
in 1997 or 1998, that he filed a case against Fountain for that murder, and
that the information Appellant provided about that murder was accurate.  

On
cross-examination, Detective Hardy agreed that the majority of people he
interviewed in this case were involved with drugs in one way or another.  He testified that the family initially
directed him to a person named Jonathan Williams and that he was aware of two
different people known as ADough Boy@ in the
Fort Worth area.  Detective Hardy also
said that he prepared approximately ten photo spreads in the case and that
several people were not able to make any identifications. 

Fountain
testified that he is in custody for two murders and a federal drug case.[7]  He said that he is serving a thirty-five year
sentence for the federal drug case, that he pleaded guilty to two murders and
received two sentences of twenty-two years and six months to run concurrently,
and that a condition of his State plea bargain required him to testify
truthfully in Appellant=s case. Fountain also said that he
had been on parole for a different felony drug case in Louisiana and that he
had other felony convictions in Tarrant County for attempted murder, evading
arrest, and detention of a vehicle. 








Fountain
further testified that Appellant and Anderson are his cousins and that
Appellant is known as ADough Boy.@  Fountain said that he, Appellant, and
Anderson had smoked Aweed@ the
night of the shooting and were at another cousin=s
apartment when Appellant started talking about Ahitting a
lick,@ which he
understood to mean to commit a robbery. 
Fountain testified that Appellant said that he wanted to Ago hit a
lick@ on
Allison and that Appellant called Allison to set up the robbery by telling
Allison that he needed to buy some drugs. 
Fountain said he understood from Appellant that Allison had a lot of
drugs and money.  Fountain testified that
he did not know Allison before the night of the shooting.  

Fountain
said that he, Appellant, and Anderson went to Anderson=s sister=s house
to get three guns: a shotgun, a revolver, and a .45.  Fountain said he had the shotgun and
Appellant had the revolver.  Anderson
drove to Allison=s apartment, Appellant rode in
the passenger seat, and Fountain rode in the back. Fountain testified that when
they arrived at the apartment, he saw Fish in the parking lot and told Fish to
leave.  Fountain said that he and
Appellant got out of the car, that Anderson stayed in the car, and that he and
Appellant went into the apartment with Allison and another man he did not
know.  The man Fountain did not know
initially said they both could not go inside, but Allison invited them both
into the apartment. 








Fountain
testified that Allison was Aweighing
up the dope@ inside the apartment and that
Appellant pulled out a revolver and made Allison and the other man get on the
floor.  Fountain then went to the car and
retrieved a shotgun.  Fountain said that
on his way back into the apartment, another man on the side of the building ran
through the gate.  Fountain went back
into the apartment, and Anderson followed him inside.  They were looking through the apartment for
things to take in the robbery when Aall of a
sudden [Allison] got up and ran.@  Fountain testified that Appellant shot
Allison four or five times as Allison ran. 


Fountain
testified that after the shooting, he, Appellant, and Anderson went to Fountain=s sister=s house
and split up what they had stolen:  A$1,500,
about ten grams of cocaine, crack[,] and a scale.@  Fountain said he emptied the revolver after
the shooting and threw the rounds in the trash, even though it was Appellant=s gun,
because Awhen you
do stuff like that with people, you=ve got to
help clear yourself, too, man.  And that=s just
part of what I did.@ 
Fountain said that there was an agreement among them to rob Allison but
that there was no agreement for murder. 
Fountain admitted on cross-examination that this was not the first Adope
house@ that he
had Ajacked.@  

Fountain
testified that he recalled telling Detective Hardy that this type of violence
was not normal for Appellant.  Fountain
also said he was aware that a man named Bertram Bell had claimed to have heard him
brag to his girlfriend that he had committed the murder.  Fountain said his girlfriend testified in his
federal case that she did not know anything about Allison getting killed. 








Kevin
Spencer testified that he had known Appellant, Fountain, Anderson, and Allison
for several years before the shooting. 
He said that he was currently serving a fifteen-year sentence in a
federal penitentiary for conspiracy to distribute and manufacture cocaine arising
out of a federal drug investigation. Spencer testified that the prosecutors had
agreed to notify federal authorities of his assistance if he testified
truthfully in Appellant=s trial so that he could apply
for ARule 35
credit,@ one of
only a few procedures he believed might potentially reduce his federal
sentence.  

Spencer
testified that he talked with Appellant three different times after the
shooting and that Appellant told him, AI put my
work in.@  Spencer explained, A[i]n
street terms[,] when they say they >put their
work in,= you
know, nine times out of ten you=re going
to shoot someone with the intention to kill them.@  Spencer testified that Appellant told him he
shot Allison because Allison went for a gun, but he also said Appellant bragged
about having Aput that work in@ and
seemed proud of having done so.  Spencer
said Appellant told him people in the neighborhood Athink I
won=t put the
work in.  I=m going
to put the work in.@ 
Spencer testified that he believed Appellant wanted people to think he
was a gangster and that killing Allison was a way for Appellant to Amake his
point.@[8] 








Bertram
Bell testified for Appellant.  He said
that he was brought to trial from Florida where he is serving a twenty-year
sentence for conspiracy to distribute arising out of a federal drug
investigation.  Bell testified that he
told Detective Hardy that he overheard a conversation between Fountain and his
girlfriend in which Fountain said that he and Appellant went to Allison=s
apartment but that Appellant stayed in the car and did not know what was happening.  Bell admitted, however, that he did not hear
the entire conversation. 

Bell
testified that he was aware of Fountain always having a shotgun and that
Fountain had even pulled a shotgun on him when Fountain had tried to rob him in
the past.  Bell told Detective Hardy
during an interview that Fountain had a shotgun and a .380.  Bell testified that he likes Appellant and
that he does not like Fountain.[9]









Dr. Gary
Sisler testified that he performed an autopsy on Allison=s body on
July 25, 2004.  Dr. Sisler testified that
Allison had an entry wound to his right lateral forearm, an exit wound on the
inside of his forearm, a re-entry wound to his right chest, an entry wound to
his back, and an entry wound near his abdomen. 
Dr. Sisler also said that he recovered three bullets from Allison=s
body.  Dr. Sisler testified that the
wound to Allison=s chest was fatal, that the cause
of death was multiple gunshot wounds, and that he classified Allison=s death
as a homicide.  Robert Adkins, a retired
firearms examiner, testified that he examined the three bullets removed from
Allison=s body
and determined that all three bullets were fired from the same gun, a Smith and
Wesson revolver. 

III. 
Applicable Law

Section
19.03(a) of the penal code provides in pertinent part, A[a]
person commits [capital murder] if the person commits murder as defined under
Section 19.02(b)(1) and . . . the person intentionally commits the murder in
the course of committing or attempting to commit . . . robbery.@  Tex. Penal Code Ann. '
19.03(a).  Section 19.02(b)(1) of the
penal code provides that a person commits murder if he Aintentionally
or knowingly causes the death of an individual.@  Id. '
19.02(b)(1) (Vernon 2003).  Section 29.02
of the penal code provides in relevant part that a person commits robbery Aif, in
the course of committing theft . . . and with intent to obtain or maintain
control of the property, he . . . intentionally, knowingly, or recklessly
causes bodily injury to another.@  Id. '
29.02(a)(1) (Vernon 2005).

IV. 
Sufficiency of the Evidence








In his
first point, Appellant contends the evidence is factually insufficient to
sustain his capital murder conviction.[10]  He argues that only unobjected-to hearsay and
testimony from a convicted felon corroborated the accomplice=s
testimony.  Because it is unclear whether
Appellant challenges the sufficiency of the evidence corroborating his
accomplice=s testimony, the factual
sufficiency of the evidence, or both, we review the evidence for corroboration
of the accomplice=s testimony and for factual
sufficiency. 

A.  Accomplice Witness Testimony

The
accomplice-witness rule is a statutorily imposed sufficiency review and is not
derived from federal or state constitutional principles that define the legal
and factual sufficiency standards.  Cathey
v. State, 992 S.W.2d 460, 462B63 (Tex.
Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000).  An accomplice is a person who participates
before, during, or after the commission of the crime and can be prosecuted for
the same offense as the defendant or for a lesser‑included offense.  Medina v. State, 7 S.W.3d 633, 641
(Tex. Crim. App. 1998).  Fountain is an
accomplice as a matter of law because he was also charged with and pleaded
guilty to Allison=s murder.  See Brown, 270 S.W.3d at 567 (stating
witness in capital murder case was accomplice as a matter of law because he Aparticipated
in the crime and . . . was subsequently convicted of aggravated robbery in
accordance with a plea agreement for his participation@).  Article 38.14 of the code of criminal
procedure provides that A[a] conviction cannot be had upon
the testimony of an accomplice unless corroborated by other evidence tending to
connect the defendant with the offense committed; and the corroboration is not
sufficient if it merely shows the commission of the offense.@  Tex. Code Crim. Proc. Ann. art. 38.14.  








When
evaluating the sufficiency of corroboration evidence under the accomplice‑witness
rule, we Aeliminate the accomplice
testimony from consideration and then examine the remaining portions of the
record to see if there is any evidence that tends to connect the accused with
the commission of the crime.@  Malone v. State, 253 S.W.3d 253, 257
(Tex. Crim. App. 2008) (quoting Solomon v. State, 49 S.W.3d 356, 361
(Tex. Crim. App. 2001)).  The
corroborating evidence need not prove the defendant=s guilt
beyond a reasonable doubt by itself.  Id.;
Trevino v. State, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999).  Nor is it necessary for the corroborating
evidence to directly link the accused to the commission of the offense.  Cathey, 992 S.W.2d at 462.  Rather, the evidence must simply link the
accused in some way to the commission of the crime and show that Arational
jurors could conclude that this evidence sufficiently tended to connect [the
accused] to the offense.@ 
Simmons v. State, 282 S.W.3d 504, 508 (Tex. Crim. App.
2009).  Additionally, A[p]roof
that the accused was at or near the scene of the crime at or about the time of
its commission, when coupled with other suspicious circumstances, may tend to
connect the accused to the crime so as to furnish sufficient corroboration to
support a conviction.@ 
Malone, 253 S.W.3d at 257 (quoting Brown v. State, 672
S.W.2d 487, 489 (Tex. Crim. App. 1984)). 
But Amere presence alone of a
defendant at the scene of a crime is insufficient to corroborate accomplice
testimony.@ 
Id. (quoting Golden v. State, 851 S.W.2d 291, 294 (Tex.
Crim. App. 1993)). 








Here, the
evidence offered to corroborate Fountain=s
testimony begins with  Appellant=s written
statements to Detective Hardy.  In the
written statements, Appellant admitted that he was inside Allison=s
apartment with Fountain at the time of the shooting.  In addition, Spencer testified that Appellant
told him on three occasions that he Aput his
work in,@ that Aputting
your work in@ meant shooting someone with the
intent to kill, and that Appellant bragged about killing Allison.  This evidence tends to connect Appellant to
the commission of the offense alleged in the indictment.  See Brown, 270 S.W.3d at 568 (stating
that Aunder
most circumstances, an admission or confession will be sufficient to
corroborate the accomplice‑witness testimony@ and
holding that accomplice testimony sufficiently corroborated by admitted
perjurer who testified Brown acted unusually the day of the offense and
admitted to being at the scene).  The
fact that Spencer=s testimony may have been subject
to impeachment as coming from an admitted felon goes to the weight of the
evidence, not to its admissibility, and was within the province of the jury as
the exclusive judge of the credibility and the weight to be given Spencer=s
testimony.  See id.  Consequently, we hold that Fountain=s
testimony was sufficiently corroborated and was properly considered by the jury
under the requirements of article 38.14. 
See Tex. Code Crim. Proc. Ann. art. 38.14.  We overrule this portion of Appellant=s first
point.

B.  Factual Sufficiency

1.  Standard of Review








When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party.  Steadman v. State, 280 S.W.3d 242, 246
(Tex. Crim. App. 2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006).  We then ask whether the
evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Steadman, 280 S.W.3d at
246; Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, although legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.  








Unless we
conclude that it is necessary to correct manifest injustice, we must give due
deference to the factfinder=s
determinations, Aparticularly those determinations
concerning the weight and credibility of the evidence.@  Johnson v. State, 23 S.W.3d 1, 9 (Tex.
Crim. App. 2000); see Steadman, 280 S.W.3d at 246.  Evidence is always factually sufficient when
it preponderates in favor of the conviction. 
Steadman, 280 S.W.3d at 247; see Watson, 204 S.W.3d at
417.  Unless the record clearly reveals
that a different result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Our deference in this regard safeguards the
defendant=s right to a trial by jury.  Lancon v. State, 253 S.W.3d 699, 704
(Tex. Crim. App. 2008).

2.  The Evidence is Factually Sufficient

Having
determined that Fountain=s accomplice‑witness
testimony was sufficiently corroborated, we now analyze all the evidenceCincluding
Fountain=s
testimonyCin a neutral light to determine
if factually sufficient evidence exists to support Appellant=s
conviction.  See Steadman, 280
S.W.3d at 246.








Reviewing
all the evidence in a neutral light, we recall that many of the people
Detective Hardy interviewed in this case were involved with drugs in one way or
another, that Detective Hardy prepared approximately ten photo spreads in the
case, that several people were not able to make any identifications, that
Allison=s family
initially directed Detective Hardy to Jonathan Williams, that Detective Hardy
knew of at least two people in the area known as ADough
Boy,@ and that
Appellant was mistakenly arrested in a federal drug case because someone else had
used Appellant=s name.  We also recall that Fluker tentatively
identified Appellant in a photo spread as the person that approached her car in
the apartment parking lot and that Fluker=s
identification differed from the others because she said the heavy-set man, not
the skinnier man, retrieved the shotgun from the car.  Further, Carter, on parole from a fifty-year
sentence,  identified Fountain from a
photo spread as the man outside the apartment with the shotgun, but Carter
testified that he had used crack the day of the shooting and that he did not
see the man well enough to identify him for the police.  In addition, Appellant admitted to being at
the scene of the shooting, but did not admit to being a party to the murder, to
receiving any of the proceeds of the robbery, to disposing of the cartridges
from the revolver, or to having the intent before going to Allison=s
apartment to commit an offense other than purchasing drugs.  There was also testimony from Bell that
impeached Fountain=s credibility and that Fountain
had admitted to shooting Allison.  And
Fountain admitted that he emptied the revolver after the shooting, that this
was not the first Adope house@ that he
had Ajacked,@ and that
this type of violence was not normal for Appellant.  Finally, Spencer testified that Appellant
bragged to him about shooting Allison, but Spencer testified in exchange for
the State=s agreement to notify federal
authorities of his cooperation.








However,
the jury also heard evidence that Appellant admitted being at Allison=s
apartment with Fountain and Anderson to obtain cocaine to sell and that
Appellant told Spencer that he Aput his
work in,@ meaning
he shot Allison with the intent to kill. 
Spencer said that Appellant bragged about having Aput that
work in,@ that
Appellant seemed proud of having done so, that Appellant wanted people to think
he was a gangster, and that killing Allison was a way for Appellant to Amake his
point.@  Furthermore, Fountain testified that
Appellant initiated the talk about robbing Allison and that Appellant called
Allison and told him he needed to buy some drugs in order to set up the
robbery.  Fountain said he had the shotgun
and Appellant had the revolver.  Fountain
testified that he and Appellant went into the apartment with Allison, that
Appellant pulled out a revolver and made Allison and the other man get on the
floor, that Fountain then went to the car for the shotgun and returned to the
apartment, and that Appellant shot Allison four or five times after Allison got
up and ran.  Fountain also testified that
they had stolen A$1,500, about ten grams of
cocaine, crack[,] and a scale.@  Finally, the firearms examiner testified that
the three bullets removed from Allison=s body
were fired from a Smith and Wesson revolver.

Moreover,
we note that several witnesses corroborated extraneous parts of Fountain=s
testimony.  For example, Carter testified
that Aa slim
fella@ with a
shotgun told him and others in his car to leave, and Detective Hardy said
Carter tentatively identified the man with the shotgun as Fountain from a photo
spread.  Further, Foreman testified that
Henderson initially told the skinnier man he could not go inside the apartment
with Allison, that the skinnier man entered but later walked out of Allison=s
apartment, talked to the people in Fish=s car,
and retrieved a shotgun from the car. 
The jury could have considered this testimony in weighing Fountain=s
credibility.








Finally,
the fact that several witnesses are convicted felons does not necessarily
render the evidence factually insufficient. 
The witnesses were impeached with evidence of their convictions, and the
jury is the exclusive judge of the credibility of the witnesses and of the
weight to be given to their testimony.  See
Johnson, 23 S.W.3d at 8 (describing difficulty in assessing credibility
from Aa cold
appellate record@ and stating credibility
assessment Ausually requires deference to the
jury=s
conclusion@).

Viewing
the evidence in a neutral light, we conclude a rational trier of fact could
have found beyond a reasonable doubt that Appellant intentionally or knowingly
caused the death of Allison in the course of committing or attempting to commit
robbery.  See Tex. Penal Code Ann.
''
19.02(b)(1), 19.03(a)(2).  Therefore, we
cannot say that the evidence is so weak that the jury=s
determination is clearly wrong or manifestly unjust or that the conflicting
evidence so greatly outweighs the evidence supporting the convictions that the jury=s
determination is manifestly unjust.  See
Lancon, 253 S.W.3d at 704; Watson, 204 S.W.3d at 414B15,
417.  Accordingly, we hold that the
evidence is factually sufficient to support the jury=s
verdict, and we overrule the remainder of Appellant=s first
point.

V. 
Effectiveness of Counsel

In his
second point, Appellant contends that he received ineffective assistance of
counsel because his trial attorney did not object to Detective Hardy=s hearsay
testimony that Fluker identified Appellant as the person who approached her
vehicle with a weapon the night of the incident.  The State responds that we should overrule
Appellant=s second point because Appellant
did not file a motion for new trial to develop the record and the record is
silent concerning Appellant=s counsel=s
reasoning and strategy. 

A.  Standard of Review








To
establish ineffective assistance of counsel, Appellant must show by a
preponderance of the evidence that his counsel=s
representation fell below the standard of prevailing professional norms and
that there is a reasonable probability that, but for counsel=s
deficiency, the result of the trial would have been different.  Strickland v. Washington, 466 U.S.
668, 687, 104 S. Ct. 2052, 2064 (1984); Salinas v. State, 163 S.W.3d
734, 740 (Tex. Crim. App. 2005); Mallett v. State, 65 S.W.3d 59, 62B63 (Tex.
Crim. App. 2001); Thompson v. State, 9 S.W.3d 808, 812 (Tex.
Crim. App. 1999).  There is no
requirement that we approach the two-pronged inquiry of Strickland in
any particular order, or even address both components of the inquiry if the
appellant makes an insufficient showing on one component.  Strickland, 466 U.S. at 697, 104 S.
Ct. at 2069.

A
reviewing court will rarely be in a position on direct appeal to fairly
evaluate the merits of an ineffective assistance claim.  Thompson, 9 S.W.3d at 813B14.  AIn the
majority of cases, the record on direct appeal is undeveloped and cannot
adequately reflect the motives behind trial counsel=s
actions.@  Salinas, 163 S.W.3d at 740 (quoting Mallett,
65 S.W.3d at 63).  To overcome the
presumption of reasonable professional assistance, Aany
allegation of ineffectiveness must be firmly founded in the record, and the
record must affirmatively demonstrate the alleged ineffectiveness.@  Id. (quoting Thompson, 9 S.W.3d
at 813).  It is not appropriate for an
appellate court to simply infer ineffective assistance based upon unclear
portions of the record.  Mata v. State,
226 S.W.3d 425, 432 (Tex. Crim. App. 2007).








B.  Analysis

Detective
Hardy testified that Fluker tentatively identified Appellant in a photo
spread.  In addition, on State=s Exhibit
24, the photo spread from which Fluker identified Appellant, Fluker had
written, AI believe to my knowledge this
man [Appellant] come to SUV I was in.@  Appellant did not object to Detective Hardy=s
testimony about Fluker=s statements to him, the
admission of the photo spread, or the inclusion of Fluker=s written
comment on the photo spread.  According
to Appellant, this unobjected-to hearsay, in combination with the testimony of
a convicted felon, placed Appellant at the scene and in possession of a
pistol-grip shotgun.  We note, however,
that the jury also heard testimony by Detective Hardy that Appellant admitted
to being inside the apartment with Fountain and Anderson when Allison was
killed and testimony by Fountain that Appellant shot Allison.

Appellant
did not file a motion for new trial, and the record is silent as to defense
counsel=s reasons
for not objecting to Detective Hardy=s
testimony or the photo spread. 
Generally, a silent record that provides no explanation for counsel=s actions
will not overcome the strong presumption of reasonable assistance.  See Rylander v. State, 101 S.W.3d 107,
110 (Tex. Crim. App. 2003); Edwards v. State, 280 S.W.3d 441, 445 (Tex.
App.CFort
Worth 2009, pet. ref=d).








Based on
the record before us, in light of the strong presumption of reasonable
professional assistance by defense counsel, and in the absence of any
opportunity for defense counsel to explain his motive for not objecting to
Detective Hardy=s testimony and the photo spread,
we cannot say that Appellant has met his burden of showing by a preponderance
of the evidence that his trial counsel=s
representation fell below the standard of prevailing professional norms.  See Strickland, 466 U.S. at 690, 104
S. Ct. at 2066; Rylander, 101 S.W.3d at 110; Thompson, 9 S.W.3d
at 813; Edwards, 280 S.W.3d at 445; see also Goodspeed v. State,
187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (stating that Atrial
counsel should ordinarily be afforded an opportunity to explain his actions
before being denounced as ineffective@).  We overrule Appellant=s second
point.

VI.  Conclusion

Having
overruled each of Appellant=s points,
we affirm the trial court=s judgment.

 

PER CURIAM

 

PANEL: GARDNER, DAUPHINOT, and WALKER, JJ.

 

PUBLISH

 

DELIVERED:  June 17, 2010











[1]See Tex. Penal Code Ann. ' 19.03(a)(2) (Vernon
Supp. 2009).





[2]Carter described Fluker as
a Acrackhead@ that he and Allison knew
from Athe life of dealing drugs.@





[3]Fluker and Henderson did
not testify at Appellant=s trial.  Detective Hardy said he unsuccessfully tried
locating them before trial.





[4]The October 2004 physical
description in Detective Hardy=s file listed Appellant at 225 pounds, and the
January 2006 description listed Appellant at 275 pounds.





[5]Appellant did not object
to Detective Hardy=s testimony about Fluker=s statements to him, the
admission of the photo spread, or the inclusion of Fluker=s written comment on the
photo spread.





[6]Detective Hardy testified
that he did not have enough corroborating information from his investigation to
charge Anderson with Allison=s murder. 
And although the State called Anderson as a witness at trial, Anderson
advised the trial court outside the presence of the jury that he would refuse
to testify because of three pending felony cases.





[7]Fountain testified that he
pleaded guilty to murder in Allison=s death and that he pleaded guilty to a 1997 or
1998 murder.  As a matter of law,
Fountain=s trial testimony was that
of an accomplice-witness.  See Brown
v. State, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008), cert. denied,
129 S. Ct. 2075 (2009).





[8]To impeach Spencer=s credibility, defense
counsel asked Spencer if he had anything to do with the murder of Appellant=s brother, Montrell
Clark.  Spencer denied involvement, and
Detective Michael Carroll testified that he investigated Montrell=s murder, that Eddie
Taylor was charged and pleaded guilty to murdering Montrell, and that Spencer
was never a suspect in Montrell=s murder.





[9]Assistant United States
Attorney Mike Worley testified as a rebuttal witness for the State.  He said that he prosecuted many of the
defendants in the federal drug investigation, that Bell pleaded guilty in that
case and provided information about several defendants, and that Bell recanted
his testimony as to all but one of the defendants.  Worley testified that the government could
have asked the court to rescind Bell=s plea agreement because he violated his plea
agreement by recanting his testimony.





[10]Appellant does not challenge
the legal sufficiency of the evidence and acknowledges that the evidence is
legally sufficient to sustain his conviction because of Carter=s testimony and Fluker=s hearsay identification
of Appellant as a person at the scene with a weapon.